Chase J. Potter
Texas Bar No. 24088245
Joshua J. Iacuone
Texas Bar No. 24036818
Greg McAllister
Texas Bar No. 24071191
Joshua L. Shepherd
Texas Bar No. 24058104
Jesse A. Okiror
Texas Bar No. 24065843
Anna Olin Richardson
Texas Bar No. 24102947
potter@imcplaw.com
josh@imcplaw.com
greg@imcplaw.com
shepherd@imcplaw.com
jesse@imcplaw.com
anna@imcplaw.com
IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
214.432.1536

COUNSEL FOR THE AGENT AND
PROPOSED SPECIAL COUNSEL FOR TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 7 |
| WITH PURPOSE, INC. | § § | Case No. 23-30246-MVL-7 |
| Debtor. | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § § | |
| Plaintiff, | § § | |
| v. | § § | Adv. No. 25-_____ |
| CHAPMAN AND CUTLER LLP; and CATHERINE ROSSOUW | § § § | |
| Defendants. | § § | |

---

TRUSTEE'S ORIGINAL COMPLAINT                                                    PAGE 1

## TRUSTEE'S ORIGINAL COMPLAINT

Scott M. Seidel (the "Trustee" or "Plaintiff"),[1] as the chapter 7 trustee of With Purpose, Inc. (the "Debtor" or "GloriFi" or the "Company"), the debtor in the above-styled chapter 7 bankruptcy case (the "Bankruptcy Case"), files this Original Complaint (the "Complaint") against the following (collectively, "Defendants" or the "Firm"): Chapman and Cutler LLP ("Chapman Cutler") and Catherine Rossouw ("Rossouw"). In support thereof, the Trustee respectfully shows the Court as follows:

### I.
### SUMMARY – WHAT THIS LAWSUIT IS ABOUT

1.      This lawsuit is filed to hold Chapman Cutler responsible for intentional, repeated, and concerning violations of the ethical and fiduciary obligations the Firm owed its client – GloriFi – which resulted in GloriFi suffering ***massive*** financial harm.

2.      In 2022, during perhaps the most critical time in GloriFi's history – which ultimately culminated in (i) GloriFi not closing the proposed de-SPAC transaction on the table and going public at a valuation of ***$1.7 billion*** and (ii) GloriFi's ultimate demise – various lawyers at Chapman Cutler (primarily Defendant Catherine Rossouw) were legal architects behind Toby Neugebauer's (the Firm's other client) development and execution of a scheme. That scheme included (i) removing independent directors (despite the Firm acknowledging ***in writing*** that doing so would harm GloriFi and lead to litigation against the Company) and (ii) amending GloriFi's governing documents to force through self-dealing transactions to further Mr. Neugebauer's personal interests to the clear detriment of GloriFi.

---

[1]      Pursuant to the court-approved 9019 Agreement and Joint Prosecution Agreement, GloriFi Acquisitions, LLC (the "Agent") as the exclusive agent of, and in the name of, the Trustee authorizes and approves the filing of this action.

3.      The Firm's active and knowing involvement in wrongdoing (outlined further herein) resulted in the Firm's own client (GloriFi) going from the doorstep of closing a de-SPAC transaction that would have taken the Company public at a valuation of **_$1.7 billion_** to chapter 7 bankruptcy **_within months_**.

4.      The Firm's representation of GloriFi was severely tainted by obvious and egregious conflicts of interest. In addition to GloriFi, the Firm both subsequently and simultaneously represented (i) Mr. Neugebauer personally and (ii) various separate entities owned and/or controlled by Mr. Neugebauer. The Firm's attempt to wear many hats, and to extract substantial fees, resulted in the Firm intentionally taking actions adverse to its own client – specifically, GloriFi.

5.      The Firm owed GloriFi various fiduciary duties, including but not limited to the duty of loyalty, duty of good faith, duty of prudence, duty of candor, and duty of confidentiality. The Trustee's investigation to date, which remains ongoing and includes reviewing scores of e-mails between the Firm's lawyers and Mr. Neugebauer, revealed that the Firm's loyalty clearly lied with Mr. Neugebauer, **_not_** GloriFi.

6.      For example, on April 10, 2022, Ms. Rossouw sent Mr. Neugebauer (and his sons) an e-mail stating:

> "*As we have said, we are your counsel and **ONLY** your counsel. We are not talking directly to anyone else on the GloriFi team or board, and we will not unless you give us express instructions to do so.*"

Unbelievably, a mere four days after expressly emphasizing allegiance to Mr. Neugebauer (and disavowing the Firm's allegiance to its client GloriFi), Chapman Cutler **_sent GloriFi an invoice for over $250,000!_** It is hard to imagine a more brazen breach of a law firm's fiduciary and ethical obligations to its client.

7.     The Firm's undying allegiance to Mr. Neugebauer continued throughout GloriFi's bankruptcy proceeding. The Firm signed the Restructuring Support Agreement ("RSA") in support of the Motion to Convert the GloriFi bankruptcy proceeding to chapter 11, which was filed at Mr. Neugebauer's direction over 17 months into the case. By signing the RSA, Chapman Cutler affirmed to this federal bankruptcy court that the Firm supported the proposed "Neugebauer chapter 11 conversion plan." The plan did not propose the restructuring of any business for GloriFi. Instead, the sole strategy of the "Neugebauer chapter 11 conversion plan" was to pursue a lawsuit (which lacked documented evidentiary support) alleging a grand RICO conspiracy against approximately 30 proposed defendants, which include some of the most successful and influential business leaders in the country (*e.g.*, Ken Griffin's Citadel, LLC; Vivek Ramaswamy; Joseph Ricketts; Joe Lonsdale; Peter Thiel; Jeff Sprecher; Rick Jackson, Nick Ayers, Keri Findley, and more).

8.     Chapman Cutler signed the RSA as an alleged "supporting general unsecured creditor" and represented that the Firm's "amount of claim" is $519,963.17. However, when the claims register is reviewed, Chapman Cutler failed to file a proof of claim as required to assert a claim in the bankruptcy proceeding. Thus, it appears the Firm deceptively signed the RSA (wrongfully claiming to be a "creditor" with a "claim" against the Estate) in the Firm's attempt to assist Mr. Neugebauer's efforts to pursue RICO conspiracy claims (without documented evidentiary support) against the highly-respected investors listed above. The lengths Chapman Cutler will go to further Mr. Neugebauer's self-interested agenda (notwithstanding the negative impact on GloriFi) truly know no bounds.

9.     The Trustee, through his investigation of e-mails on which GloriFi representatives were copied, has already uncovered multiple smoking gun e-mails ***authored by the Firm***

establishing intentional and astonishing breaches of various fiduciary and ethical obligations the Firm owed GloriFi. But Chapman Cutler has intentionally deprived the Trustee the ability of reviewing the Firm's internal e-mails regarding its representation of GloriFi. It is indisputable that such internal Firm e-mails are part of the client file and, thus, belong to GloriFi (*i.e.*, the Estate). However, as of the date of this filing, ***Chapman Cutler has failed to turn over GloriFi's entire client file (in clear violation of section 542 of the Bankruptcy Code)*** despite demand from the Trustee. Given what has already been uncovered, one can only imagine the alarming misdeeds Chapman Cutler must be trying to hide through its refusal to simply turn over the file and, instead, frantically attempting to review and "clean" the file before production.

10.     In this lawsuit, the Trustee asserts the following claims against Chapman Cutler and Ms. Rossouw: (1) negligence (legal malpractice) against all Defendants, (2) breach of fiduciary duty against all Defendants, and (3) various fraudulent transfer and disallowance claims against Chapman Cutler.

## II.
### JURISDICTION AND VENUE

11.     On February 8, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, thereby initiating the Bankruptcy Case and creating its bankruptcy estate (the "Estate").

12.     The Trustee is the duly appointed chapter 7 trustee of the Estate.

13.     The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.

14.     Such jurisdiction is core under 28 U.S.C. § 157(b)(2). To the extent that any matter in this adversary proceeding is not core, the Trustee consents to this Court's entry of final orders and judgment.

15.     Venue of this adversary proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## III.
### THE PARTIES

16.     The Trustee is the chapter 7 trustee of the Estate and files this Complaint in such capacity.

17.     Defendant Chapman and Cutler LLP is a law firm with its primary office in Chicago, Illinois. Pursuant to Fed. R. Bank. P. 7004(b), Chapman Cutler may be served with process in this Adversary Proceeding by and through its registered agent as follows: Cogency Global, Inc., 1601 Elm St., Suite 4360, Dallas, Texas 75201.

18.     Upon information and belief, Defendant Catherine Rossouw is a resident of the State of New York. Pursuant to Fed. R. Bankr. P. 7004(b), Rossouw may be served with process in this Adversary Proceeding anywhere that she may be found, including at her business address: 1270 Avenue of the Americas, 30th Floor, New York, New York 10020-1708.

## IV.
### THE FACTS

---

***Chapman Cutler was hired to represent GloriFi, but Chapman Cutler favored its other client – Toby Neugebauer – to GloriFi's extreme detriment.***

---

19.     Chapman Cutler represented GloriFi since around the Company's inception – even with respect to preparing the very corporate documents the Firm later assisted Mr. Neugebauer (GloriFi's co-founder, CEO, and Chairman of the Board) in violating to the detriment of GloriFi and its many other stakeholders. In a sign of things to come, when Chapman Cutler originally performed work for GloriFi, the Firm was only looking out for Mr. Neugebauer's personal interests – not those of GloriFi.

20.     For example, on May 3, 2021, Rossouw (one of the Firm's equity partners) assured Mr. Neugebauer that Chapman Cutler was protecting **Mr. Neugebauer's interests** when preparing the Company's corporate documents:

> *"It's **your lawyers'** job to think through worst-case scenarios, e.g., what if Rick and Kristi want to oust you or just take the company in a different direction than what you are comfortable with?"*

21.     Unfortunately for GloriFi, the Firm was only doing its job for one of its other clients (Mr. Neugebauer) and was more than willing to actively and intentionally advance positions adverse to GloriFi – anything to satisfy Mr. Neugebauer, Chapman Cutler's prized, self-proclaimed billionaire client.

22.     In Ms. Rossouw's e-mail on May 3, 2021 (excerpted above), she went on to tell Mr. Neugebauer:

> *"You will probably have to cede some control if/when you take in material outside money…."*

23.     The sad and incredible hypocrisy in Ms. Rossouw's statement is that Chapman Cutler proceeded to do everything in its power – irrespective of whether it harmed, or even destroyed, GloriFi (the Firm's client) – to assist Mr. Neugebauer's incessant desire to cede no control over the Company (and, in fact, gain more) after GloriFi raised over $50 million from investors and was on the verge of going public. And Chapman Cutler did so on GloriFi's dime.

***Chapman Cutler represented Mr. Neugebauer, and advocated for his self-interests, against Chapman Cutler's own client – GloriFi.***

24.     In 2022, Chapman Cutler sent GloriFi an engagement agreement, which required GloriFi to pay the Firm an initial retainer in the amount of $195,000. The Firm's engagement agreement expressly states that "the Firm agrees to represent the Client [defined by the agreement

as GloriFi]" and further states that "the Firm will **not** represent anyone else in the Matter (including, for example, any principals, owners, officers, directors or employees of the Client)," which should have included Mr. Neugebauer. But Chapman Cutler intentionally disregarded and breached the terms of its own engagement agreement – and did so in a manner directly adverse to, and against, its own client GloriFi.

25.     On March 28, 2022, Bryan Joiner (known "right-hand-man" of Mr. Neugebauer) e-mailed Ms. Rossouw (GloriFi's lawyer) stating:

> *"Cathy, can we please speak on terms on the new convertible note into GloriFi? Toby will be leading and needs Chapman representing **his families [sic] interest**."*

26.     Specifically, Mr. Joiner was requesting confirmation from Ms. Rossouw that Chapman Cutler was willing to represent Mr. Neugebauer and the interests of his family ***against GloriFi*** in the "negotiation" of a self-interested term sheet/note that Mr. Neugebauer was trying to force through by any means necessary (which was part of a scheme of self-dealing employed by Mr. Neugebauer, with the assistance of Chapman Cutler, that ultimately led to the complete loss of investor trust/support and GloriFi's untimely demise). Ms. Rossouw responded without hesitation (notwithstanding the obvious conflict of interest and express prohibition of such conflicted representation in the Firm's own representation agreement):

> *"Sure – call me when convenient."*

27.     The next day, on March 29, 2022, Ms. Rossouw confirmed that she added a provision to Mr. Neugebauer's self-dealing term sheet to ensure that, if Mr. Neugebauer was no longer the CEO of GloriFi, (i) that circumstance would constitute a default under the self-interested note, and (ii) the note's outstanding balance (plus interest) would be immediately due and payable to Mr. Neugebauer by GloriFi.

28. In other words, Ms. Rossouw crafted a mechanism that would allow Mr. Neugebauer to manufacture a default against the Firm's own client (GloriFi) by simply resigning as the Company's CEO. Ms. Rossouw added this provision even though the Firm knew it directly contradicted the representations Mr. Neugebauer repeatedly made to investors and other stakeholders in GloriFi (as part of establishing normal corporate governance expected of a public company operating in a highly regulated industry) that Mr. Neugebauer would not be the CEO of GloriFi when the Company completed the de-SPAC transaction and went public.

29. To make matters worse, Ms. Rossouw added provisions to Mr. Neugebauer's self-interested note that would require GloriFi to approve an Asset Purchase and Assumption Agreement, which would have resulted in GloriFi transferring its "tech stack" (*i.e.*, the very asset Mr. Neugebauer represented to GloriFi's Series 1 investors as the extremely valuable security for their investment) to a separate entity owned and controlled by Mr. Neugebauer and/or his family. Thus, the Firm assisted Mr. Neugebauer in developing a ploy to transfer GloriFi's most valuable asset to Mr. Neugebauer.

30. The Firm even included terms in the note that the Firm *knew* directly conflicted with representations and promises Mr. Neugebauer made to investors during an "all investors call" only days prior. Specifically, on March 30, 2022, Ms. Rossouw sent an e-mail to Mr. Neugebauer and Mr. Joiner stating:

> *"Toby/Bryan . . . very clear takeaway . . . from the shareholder call was that Toby said the warrants were <u>out of the deal entirely</u> (not just out if there is a prepayment in the first 30 days or a conversion in connection with a Next Equity Financing)."*

31. Mr. Joiner's response was short and sweet:

> *"No, he [Mr. Neugebauer] wants warrants included as we discussed."*

32.    Despite the lack of any denial, or attempted clarification, from Mr. Joiner in an effort to refute Ms. Rossouw's understanding that the inclusion of warrants would potentially constitute securities fraud, Ms. Rossouw immediately did as Mr. Neugebauer said (per the Firm's usual practice).

33.    Moreover, Ms. Rossouw knew the note constituted a self-interested transaction for Mr. Neugebauer, admitting as much when she wrote:

> *"Let's have someone other than Toby sign for GloriFi."*

---

***Chapman Cutler recognized it had an irreconcilable conflict but pressed on anyway in violation of fiduciary, ethical, and contractual duties.***

---

34.    Ms. Rossouw further recognized, ***in writing***, that the Firm had an obvious conflict of interest in representing Mr. Neugebauer in a transaction on which the Firm's current client (GloriFi) was on the other side – even going so far as to admitting the need for a conflict waiver:



35.    Incredibly, the Firm requested the conflict waiver from Mr. Neugebauer himself (**long after** the Firm provided conflicted advice) instead of addressing (much less disclosing) the situation with either of GloriFi's two independent board members (Nick Ayers and Keri Findley).

Moreover, the Trustee's investigation to date has not revealed any evidence that the Firm ever received the requested conflict waiver – not even from Mr. Neugebauer (not that such a self-serving, sham, and tardy waiver would have been sufficient). Nonetheless, the Firm continued representing Mr. Neugebauer and his personal interests against the Firm's other client (GloriFi).

36.     The Firm then assisted Mr. Neugebauer in executing a classic "squeeze play" against GloriFi's investors and independent board members in an effort to force the approval of Mr. Neugebauer's self-interested term sheet. This "squeeze play" included Mr. Neugebauer (i) threatening the independent board members with litigation in the event they did not approve his self-interested term sheet, and (ii) misrepresenting to multiple investors that such investor had the "deciding vote" and would force the Company into bankruptcy that very day if the investor who Mr. Neugebauer was communicating with at the moment did not approve Mr. Neugebauer's self-dealing note, which was prepared by the Firm.

***Chapman Culter assisted Mr. Neugebauer in his self-dealing against GloriFi and then invoiced GloriFi more than $250,000 for its conflicted and improper representation.***

37.     When the independent board members attempted to uphold their fiduciary obligations to the Company and renewed prior requests for an independent legal analysis regarding any proposed transaction in which Mr. Neugebauer was self-interested (*e.g.*, the Asset Purchase and Assumption Agreement), Mr. Neugebauer responded by seeking to remove Mr. Ayers and Ms. Findley from the Company's Board and replacing them with Mr. Neugebauer's long-time friends and business partners (individuals who would rubberstamp whatever Mr. Neugebauer desired).

38.     Ms. Rossouw *initially* (and correctly) recognized that Mr. Neugebauer's proposed plan of action was reckless, only designed to further his personal interests, and would harm GloriFi.

Ms. Rossouw *initially* strongly advised Mr. Neugebauer against removing board members for the purpose of engaging in self-dealing:



39.     Unbelievably, only mere hours after Ms. Rossouw sent the e-mail above advising and recognizing that Mr. Neugebauer's proposed course would harm GloriFi, the Firm did an about-face and helped Mr. Neugebauer develop, and execute upon, a plan to effectuate his self-dealing scheme.

40.     Michael Friedman (another one of the Firm's partners) provided Mr. Neugebauer with recommendations for board members to replace Mr. Ayers and Ms. Findley. And Ms. Rossouw (the same Chapman Cutler lawyer who recognized *in writing* that removing board members to approve Mr. Neugebauer's self-interested note was improper and would harm GloriFi) prepared the legal strategy and necessary documents to do just that. Put simply, there is a wealth of evidence establishing that the Firm completely disregarded its fiduciary, ethical, and other obligations to GloriFi in favor of carrying out whatever scheme Mr. Neugebauer needed or wanted to improve his individual economic position and personal interests (irrespective of whether Mr. Neugebauer's desires harmed GloriFi). This is a textbook case of a law firm favoring one client (Mr. Neugebauer) to the extreme detriment of another (GloriFi).

41.     Just when one thinks this matter couldn't get worse, it does.

42.     After the Firm successfully executed on the legal game plan it developed to remove
Mr. Ayers and Ms. Findley from the Company's Board – which included the Firm (i) attempting
to conceal its actions by ghostwriting documents to be sent by another law firm, and (ii) eliminating
all roadblocks to Mr. Neugebauer running roughshod over the Company and engaging in
unfettered self-dealing – Ms. Rossouw, in an e-mail to Mr. Neugebauer and his sons (Noah and
Nate Neugebauer) dated April 10, 2022, removed any doubt (as if there was any left) that the
Firm's loyalty was to Mr. Neugebauer, alone, and to the detriment of the Firm's other client:

> *"As we have said, we are your counsel and **ONLY** your counsel. We are not talking
> directly to anyone else on the GloriFi team or board, and we will not unless you
> give us express instructions to do so."*

43.     Unbelievable. When Defendants sent this e-mail, they willfully disregarded that the
Firm also represented GloriFi.

44.     With sheer audacity, four days later, on April 14, 2022, the Firm **_sent GloriFi an
invoice for over $250,000_**!

45.     It is outrageous that the Firm disavowed its loyalty to GloriFi, in writing, and almost
immediately thereafter invoiced GloriFi more than a quarter million dollars. It is hard to imagine
a more egregious violation of Defendants' fundamental obligations.

---

*Against its own initial "strong" recommendation to the contrary, Chapman Cutler assisted Mr.
Neugebauer in removing independent board members to help Mr. Neugebauer run roughshod
over the Firm's own client.*

---

46.     As if all this wasn't enough, Ms. Rossouw – who is described on the Firm's website
as "a transactional private equity and corporate attorney" – decided to play litigator. Ms. Rossouw

did so by engaging in more ghostwriting (trying, yet again, to conceal the Firm's fingerprints

behind the façade of another law firm).

47.     The Firm helped prepare demand letters to Mr. Ayers and Ms. Findley (who were

the independent directors removed from GloriFi's Board by Mr. Neugebauer) after Mr. Ayers and

Ms. Findley had the "audacity" to stand up to Mr. Neugebauer's self-dealing and try to protect the

Company. Thankfully someone did; the Firm certainly was not protecting the Company.

***Chapman Cutler publicly supports Mr. Neugebauer's attempted lawsuit against Peter Thiel,
Vivek Ramaswamy, Ken Griffin's Citadel, and others alleging a fantastical RICO conspiracy.***

48.     The Firm's undying allegiance to Mr. Neugebauer even continued throughout

GloriFi's bankruptcy proceeding. The Firm signed the Restructuring Support Agreement ("RSA")

in support of the Motion to Convert the GloriFi bankruptcy proceeding to chapter 11, which was

filed at Mr. Neugebauer's direction over 17 months into the case.

49.     By signing the RSA, Chapman Cutler affirmed to the federal bankruptcy court that

the Firm supported the proposed "Neugebauer chapter 11 conversion plan." As mentioned above,

the plan did not propose the restructuring of any business for GloriFi. Instead, the sole strategy of

the "Neugebauer chapter 11 conversion plan" was to pursue a lawsuit alleging a grand RICO

conspiracy against approximately 30 proposed defendants, which include some of the most

successful and influential business leaders in the country (*e.g.*, Ken Griffin's Citadel, LLC; Vivek

Ramaswamy; Joseph Ricketts; Joe Lonsdale; Peter Thiel; Jeff Sprecher; Rick Jackson, Nick Ayers,

Keri Findley, and more).

50.     Chapman Cutler signed the RSA as an alleged "supporting general unsecured

creditor" and represented that the Firm's "amount of claim" is $519,963.17. However, as

evidenced by the claims register, Chapman Cutler did not file a verified proof of claim establishing

itself as a claimant. Thus, it appears the Firm deceptively signed the RSA (wrongfully claiming to be a "creditor" with a "claim" against the Estate) in Chapman Cutler's attempt to assist Mr. Neugebauer in his efforts to pursue the aforementioned RICO conspiracy claims.

51.    It appears the Firm supported and/or assisted Mr. Neugebauer in employing various schemes and tactics in the GloriFi bankruptcy proceeding. These same tactics were found by this Court, in a recent opinion, to constitute "an abuse of the bankruptcy process."

---

***Chapman Cutler's wrongdoing prevented GloriFi from going public at a valuation of $1.7 billion.***

---

52.    In sum, rather than abiding by any obligations the Firm owed GloriFi, the Firm intentionally took actions designed to harm the Company and benefit Mr. Neugebauer (and his other, separate entities). The Firm's actions (and deliberate inactions) proximately caused GloriFi to suffer ***enormous*** financial harm.

53.    GloriFi was on the verge of closing a de-SPAC transaction with DHC Acquisition Corp. and going public at a valuation of approximately ***$1.7 billion***. But for the Firm's intentional efforts to assist, and develop the playbook for, Mr. Neugebauer in his unrelenting and sustained self-dealing and fraud to the Company's extreme detriment, GloriFi would have been able to complete the de-SPAC transaction.

54.    Specifically, the Firm's misdeeds and collusion with Mr. Neugebauer was a proximate cause of the investors (and potential investors) losing confidence in GloriFi and the Company's resulting inability to raise the funding needed to close the de-SPAC transaction. The Company would have been able to secure the necessary funding but for the Firm's malfeasance. Instead, the Company now sits in chapter 7 bankruptcy due, at least in large part, to the Firm's

conflicted representation, malpractice, and breach of its fiduciary, contractual, and ethical obligations.

## V.
### CAUSES OF ACTION

**COUNT 1:**        **NEGLIGENCE (LEGAL MALPRACTICE) – AGAINST ALL DEFENDANTS**

55.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

56.    As GloriFi's attorneys and law firm, Defendants owed GloriFi the duty to act with reasonable care. Specifically, in Defendants' representation of GloriFi, Defendants were required to exercise the standard of care that would be exercised by a reasonably prudent attorney under the same or similar circumstances. For the reasons set forth herein, Defendants fell well below that standard and, thus, breached their duty of care to GloriFi.

57.    GloriFi suffered significant actual and consequential damages as a result of Defendants' negligence and breaches of their duty of care. The Trustee seeks all recoverable damages from Defendants resulting from their negligence, including, but not limited to, the entire loss of GloriFi's enterprise value.

**COUNT 2:**        **BREACH OF FIDUCIARY DUTY – AGAINST ALL DEFENDANTS**

58.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

59.    As GloriFi's attorneys and law firm, Defendants had a fiduciary relationship with GloriFi. As a result, Defendants owed GloriFi fiduciary duties requiring undivided loyalty, absolute and perfect candor, honesty, the utmost good faith and fidelity, the absence of any concealment, and the placement of GloriFi's interests ahead of Defendants' interests and the interests of all other parties, including Mr. Neugebauer and his family. Such duties necessarily

included Defendants' obligation to render a full and fair disclosure of all facts material to the representation of GloriFi, including conflicts of interest, and Defendants' obligation to avoid espousing irreconcilable positions to GloriFi's substantial prejudice and harm.

60.    Given the facts described herein, Defendants clearly breached the fiduciary duties Defendants owed GloriFi. Defendants also received improper benefits from their conflicted, prohibited representation of parties adverse to GloriFi (specifically, Mr. Neugebauer and his family/separate entities), and Defendants' breaches of fiduciary duty to GloriFi. For example, the improper benefits include the attorney's fees billed by Defendants to parties adverse to GloriFi (*e.g.*, Mr. Neugebauer and his family/separate entities) and fees billed to GloriFi resulting from acts taken by Defendants to intentionally harm their own client – *i.e.*, GloriFi.

61.    GloriFi suffered significant actual and consequential damages as a result of Defendants' breaches of their fiduciary duties owed to GloriFi. The Trustee seeks all recoverable damages from Defendants resulting from their breaches of fiduciary duty, including, but not limited to, the entire loss of GloriFi's enterprise value.

62.    Moreover, because of Defendants' intentional and egregious breaches of their fiduciary duties owed to GloriFi, the Trustee requests that, in addition to all other remedies and available damages, final judgment is issued requiring Defendants to disgorge and forfeit any and all fees and expenses and/or any other financial or economic benefits that Defendants obtained as a result of the acts taken by Defendants to intentionally harm their own client – *i.e.*, GloriFi.

**COUNT 3:**    **AVOIDANCE OF TRANSFER – FRAUDULENT TRANSFER (11 U.S.C. § 548) – AGAINST CHAPMAN CUTLER**

63.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

64.     GloriFi filed its voluntary petition for relief under chapter 7 of the Bankruptcy Code on February 8, 2023 (the "Petition Date").

65.     By April 2022, at the latest and following the bad acts of the Firm and Mr. Neugebauer as outlined herein, GloriFi was insolvent. The Trustee avers that GloriFi remained insolvent throughout the remainder of the Company's life.

66.     During the one-year period prior to the Petition Date, that is between February 8, 2022 and February 8, 2023, GloriFi made transfer(s) of an interest of GloriFi's property to or for the benefit of Chapman Cutler through payments totaling not less than $968,110.00 (collectively, the "Transfers") in relation to the Firm's conflicted and improper representation of GloriFi (for which GloriFi obviously did not receive reasonable equivalent value from Chapman Cutler for the reasons outlined herein, including but not limited to Chapman Cutler's simultaneous and conflicted representation of Mr. Neugebauer, Mr. Neugebauer's separate entities, and Mr. Neugebauer's family adverse to GloriFi).

67.     During the course of this proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made to Chapman Cutler during the relevant clawback period. It is the Trustee's intention to avoid and recover all transfers made by GloriFi which are voidable pursuant to the Trustee's rights under the Bankruptcy Code and applicable law. The Trustee expressly reserves his right to amend this Complaint to include further information regarding Chapman Cutler, the Transfers, and/or additional transfers that may become known to the Trustee at any time during this proceeding, through formal discovery or otherwise.

68.     GloriFi's funds constituting the Transfers were made in relation to Chapman Cutler's improper and conflicted representation of GloriFi. Accordingly, the Trustee asserts that the Transfers are fraudulent transfers under Section 548(a)(1)(B) of the Bankruptcy Code because:

        a.      GloriFi did not receive reasonably equivalent value in exchange for the Transfers; and

        b.      GloriFi was insolvent at the time of the Transfers.

**COUNT 4:**    **AVOIDANCE OF TRANSFER – FRAUDULENT TRANSFER (TEX. BUS. & COMM. CODE §§ 24.001, *et seq.*)[2]**

69.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

70.    Pursuant to Section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a pre-petition transfer by GloriFi that an unsecured creditor could avoid.

71.    In the alternative to the Trustee's fraudulent transfer claim under Section 548 of the Bankruptcy Code, the Trustee also pleads that the Transfers were fraudulent transfers under TUFTA because:

        a.      GloriFi did not receive reasonably equivalent value in exchange for the Transfers; and

        b.      GloriFi was insolvent at that time, or GloriFi became insolvent as a result of the transfer or obligation;

        c.      GloriFi was engaged or was about to engage in a business or a transaction for which the remaining assets of GloriFi were unreasonably small in relation to the business or transaction; or

        d.      GloriFi intended to incur, or believed or reasonably should have believed that GloriFi would incur, debts beyond GloriFi's ability to pay as they became due.

---

[2]    The Texas Uniform Fraudulent Transfer Act is referred to herein as "TUFTA."

72.     Accordingly, pursuant to Section 544 of the Bankruptcy Code, the Trustee is entitled to avoid the Transfers. Moreover, pursuant to Section 24.013 of TUFTA, the Trustee is entitled to his reasonable costs and attorney's fees in avoiding and recovering the Transfers.

**COUNT 5:      RECOVERY OF VOIDABLE TRANSFER (11 U.S.C. § 550)**

73.     The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

74.     Chapman Cutler was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the Transfers were made for Chapman Cutler's benefit.

75.     Pursuant to Section 550 of the Bankruptcy Code, the Trustee is entitled to recover the Transfers, in the total amount of $968,110.00, and hereby seeks a monetary judgment against the Defendant in at least that amount with respect to the claims being asserted herein in relation to the Transfers.

**COUNT 6:      DISALLOWANCE OF CLAIM (11 U.S.C. § 502)**

76.     The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

77.     Chapman Cutler is the transferee of the Transfers, which are avoidable as stated herein. As such, the Transfers are recoverable pursuant to Section 550 of the Bankruptcy Code.

78.     Chapman Cutler has not paid back any portion of the Transfers.

79.     Accordingly, pursuant to Section 502(d) of the Bankruptcy Code, any Claim,[3] if any, Chapman Cutler and/or its assignees may have against GloriFi or the Estate must be disallowed.

---

[3]      As that term is defined in Section 101(5) of the Bankruptcy Code.

80.    Moreover, pursuant to Section 502(j) of the Bankruptcy Code, any Claim, if any, Chapman Cutler and/or its assignees may have against GloriFi or the Estate which may have been previously allowed in the Bankruptcy Case, must be reconsidered and disallowed.

81.    The Trustee hereby requests that the Bankruptcy Court disallow all Claims, if any, of Chapman Culter.

## VI.
### ATTORNEY'S FEES AND EXEMPLARY DAMAGES

82.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

83.    The Trustee seeks an award of exemplary damages in this case because, for the reasons set forth herein, Defendants acted with malice (*i.e.*, the specific intent to cause substantial injury or harm to GloriFi), an extreme degree of risk and a conscious indifference to the rights of GloriFi, and/or in a fraudulent manner, Defendants committed gross negligence, and Defendants committed other acts (as outlined herein) and in a manner that justifies the imposition of exemplary damages under applicable law.

84.    The Trustee further seeks an award of the reasonable and necessary attorney's fees and costs incurred in pursuing this action. An award of attorney's fees is appropriate and just in this action under Section 24.013 of TUFTA and any other applicable statutes and/or contract provisions.

## VII.
### CONDITIONS PRECEDENT

85.    All conditions precedent to maintaining this action have occurred and been satisfied or have been excused and/or waived.

## VIII.
### CONCLUSION

Based on the foregoing, the Trustee respectfully requests the following relief from the Court:

a) Judgment against Defendants for all actual damages and any applicable special or other damages (including disgorgement);

b) Judgment against Defendants for exemplary damages;

c) Avoidance of the Transfers, upon the law and the facts, as fraudulent transfers;

d) Recovery of the Transfers by way of a monetary judgment against Chapman Cutler;

e) Judgment against Defendants for pre- and post-judgment interest at the maximum rate permitted by law;

f) Judgment against Defendants for costs of suit and reasonable and necessary attorney's fees; and

g) Such other and further relief to which the Trustee is entitled.

Respectfully submitted,

/s/ Chase J. Potter
_____

**CHASE J. POTTER**
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com

**JOSHUA J. IACUONE**
Texas Bar No. 24036818
E-Mail: josh@imcplaw.com

**GREG MCALLISTER**
Texas State Bar No. 24071191
E-Mail: greg@imcplaw.com

**JOSHUA L. SHEPHERD**
Texas Bar No. 24058104
E-Mail: shepherd@imcplaw.com

**JESSE A. OKIROR**
Texas Bar No. 24065843
E-Mail: jesse@imcplaw.com

**ANNA OLIN RICHARDSON**
Texas Bar No. 24102947
E-Mail: anna@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone:    (214) 432-1536

**COUNSEL FOR THE AGENT AND
PROPOSED SPECIAL COUNSEL FOR TRUSTEE**