Chase J. Potter
Texas Bar No. 24088245
Joshua J. Iacuone
Texas Bar No. 24036818
Greg McAllister
Texas Bar No. 24071191
Jesse A. Okiror
Texas Bar No. 24065843
Anna Olin Richardson
Texas Bar No. 24102947
potter@imcplaw.com
josh@imcplaw.com
greg@imcplaw.com
jesse@imcplaw.com
anna@imcplaw.com
IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
214.432.1536

COUNSEL FOR THE AGENT AND
SPECIAL COUNSEL FOR TRUSTEE

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 7** |
| | § | |
| **WITH PURPOSE, INC.,** | § | **Case No. 23-30246-MVL-7** |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **SCOTT M. SEIDEL, TRUSTEE,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Adv. No. 25-03037-mvl** |
| | § | |
| **CHAPMAN AND CUTLER LLP; and** | § | |
| **CATHERINE ROSSOUW,** | § | |
| | § | |
| **Defendants.** | § | |

---

## TRUSTEE'S FIRST AMENDED COMPLAINT

Scott M. Seidel (the "Trustee" or "Plaintiff"),[1] as the chapter 7 trustee of With Purpose, Inc. (the "Debtor" or "GloriFi" or the "Company"), the debtor in the above-styled chapter 7 bankruptcy case (the "Bankruptcy Case"), files this First Amended Complaint (the "Complaint") against the following (collectively, "Defendants" or the "Firm"): Chapman and Cutler LLP ("Chapman Cutler") and Catherine Rossouw ("Rossouw"). In support thereof, the Trustee respectfully shows the Court as follows:

### I.
### SUMMARY – WHAT THIS LAWSUIT IS ABOUT

1.     This lawsuit is filed to hold Chapman Cutler responsible for intentional, repeated, and concerning violations of the ethical and fiduciary obligations the Firm owed its client – GloriFi – which resulted in GloriFi suffering ***massive*** financial harm.

2.     In 2022, during perhaps the most critical time in GloriFi's history – which ultimately culminated in (i) GloriFi not closing the proposed de-SPAC transaction on the table and going public at a valuation of ***$1.7 billion*** and (ii) GloriFi's ultimate demise – various lawyers at Chapman Cutler (primarily Defendant Catherine Rossouw) were lawyer architects behind, and knowingly participated in, Toby Neugebauer's (the Firm's other client) development and execution of a scheme. That scheme included, among other things, (i) removing independent directors (despite the Firm acknowledging ***in writing*** that doing so would harm GloriFi and lead to litigation against the Company) and (ii) amending GloriFi's governing documents to force through self-dealing transactions to further Mr. Neugebauer's personal interests to the clear

---

[1]     Pursuant to the court-approved 9019 Agreement and Joint Prosecution Agreement, GloriFi Acquisitions, LLC (the "Agent") as the exclusive agent of, and in the name of, the Trustee authorizes and approves the filing of this action.

detriment of GloriFi. In addition to breaching its own obligations to its client GloriFi, the Firm knowingly participated, and aided and abetted, Mr. Neugebauer in breaching his fiduciary obligations to GloriFi.

3.      The Firm's active and knowing involvement in wrongdoing (outlined further herein) resulted in the Firm's own client (GloriFi) going from the doorstep of closing a de-SPAC transaction that would have taken the Company public at a valuation of ***$1.7 billion*** to chapter 7 bankruptcy ***within months***. The Firm's wrongdoing, as discussed herein, was a proximate cause of the substantial monetary loss GloriFi suffered, including an extreme loss of enterprise value.

4.      The Firm's representation of GloriFi was severely tainted by obvious and egregious conflicts of interest. In addition to GloriFi, the Firm both subsequently and simultaneously represented (i) Mr. Neugebauer personally and (ii) various separate entities owned and/or controlled by Mr. Neugebauer. The Firm's attempt to wear many hats, and to extract substantial fees, resulted in the Firm intentionally taking actions adverse to its own client – specifically, GloriFi.

5.      The Firm owed GloriFi various fiduciary duties, including but not limited to the duty of loyalty, duty of good faith, duty of prudence, duty of candor, and duty of confidentiality. The Trustee's investigation to date, which remains ongoing and includes reviewing scores of e-mails between the Firm's lawyers and Mr. Neugebauer, revealed that the Firm's loyalty clearly lied with Mr. Neugebauer, ***not*** GloriFi.

6.      For example, on April 10, 2022, Ms. Rossouw sent Mr. Neugebauer (and his sons) an e-mail stating:

> "*As we have said, we are your counsel and **ONLY** your counsel. We are not talking directly to anyone else on the GloriFi team or board, and we will not unless you give us express instructions to do so.*"

Unbelievably, a mere four days after expressly emphasizing allegiance to Mr. Neugebauer (and disavowing the Firm's allegiance to its client GloriFi), Chapman Cutler ***sent GloriFi an invoice for over $250,000!*** It is hard to imagine a more brazen breach of a law firm's fiduciary and ethical obligations to its client.

7.     The Firm's undying allegiance to Mr. Neugebauer continued throughout GloriFi's bankruptcy proceeding. The Firm signed the Restructuring Support Agreement ("RSA") in support of the Motion to Convert the GloriFi bankruptcy proceeding to chapter 11, which was filed at Mr. Neugebauer's direction over 17 months into the case. By signing the RSA, Chapman Cutler affirmed to this federal bankruptcy court that the Firm supported the proposed "Neugebauer chapter 11 conversion plan." The plan did not propose the restructuring of any business for GloriFi. Instead, the sole strategy of the "Neugebauer chapter 11 conversion plan" was to pursue a lawsuit (which lacked documented evidentiary support) alleging a grand RICO conspiracy against approximately 30 proposed defendants, which include some of the most successful and influential business leaders in the country (*e.g.*, Ken Griffin's Citadel, LLC; Vivek Ramaswamy; Joseph Ricketts; Joe Lonsdale; Peter Thiel; Jeff Sprecher; Rick Jackson, Nick Ayers, Keri Findley, and more).

8.     Chapman Cutler signed the RSA as an alleged "supporting general unsecured creditor" and represented that the Firm's "amount of claim" is $519,963.17. However, when the claims register is reviewed, Chapman Cutler failed to file a proof of claim as required to assert a claim in the bankruptcy proceeding. Thus, it appears the Firm deceptively signed the RSA (wrongfully claiming to be a "creditor" with a "claim" against the Estate) in the Firm's attempt to assist Mr. Neugebauer's efforts to pursue RICO conspiracy claims (without documented evidentiary support) against the highly-respected investors listed above. The lengths Chapman

Cutler will go to further Mr. Neugebauer's self-interested agenda (notwithstanding the negative impact on GloriFi) truly know no bounds.

9.      The Trustee, through his investigation of e-mails on which GloriFi representatives were copied, has already uncovered multiple smoking gun e-mails ***authored by the Firm*** establishing intentional and astonishing breaches of various fiduciary and ethical obligations the Firm owed GloriFi. But Chapman Cutler has intentionally deprived the Trustee of the ability to review all the Firm's internal e-mails regarding its representation of GloriFi. It is indisputable that all such internal Firm e-mails are part of the client file and, thus, belong to GloriFi (*i.e.*, the Estate). However, as of the date of this filing, ***Chapman Cutler has failed to turn over GloriFi's entire, unredacted client file (in clear violation of section 542 of the Bankruptcy Code)*** despite demand from the Trustee. Given what has already been uncovered, one can only imagine the alarming misdeeds Chapman Cutler must be trying to hide through its refusal to simply turn over the entire file and, instead, frantically attempting to review and "clean" the file before production.

10.      In this lawsuit, the Trustee asserts the following claims against Chapman Cutler and Ms. Rossouw: (1) negligence (legal malpractice), and (2) knowing participation/aiding and abetting Mr. Neugebauer in his breaches of the fiduciary duties he owed to the Debtor.

## II.
### JURISDICTION AND VENUE

11.      On February 8, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, thereby initiating the Bankruptcy Case and creating its bankruptcy estate (the "Estate").

12.      The Trustee is the duly appointed chapter 7 trustee of the Estate.

13.      The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.

14.     Such jurisdiction is core under 28 U.S.C. § 157(b)(2). To the extent that any matter in this adversary proceeding is not core, the Trustee consents to this Court's entry of final orders and judgment.

15.     Venue of this adversary proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

### III.
### THE PARTIES

16.     The Trustee is the chapter 7 trustee of the Estate and files this Complaint in such capacity.

17.     Defendant Chapman and Cutler LLP is a law firm with its primary office in Chicago, Illinois. Pursuant to Fed. R. Bankr. P. 7004(b), Chapman Cutler may be served with process in this Adversary Proceeding by and through its registered agent as follows: Cogency Global, Inc., 1601 Elm St., Suite 4360, Dallas, Texas 75201. Chapman Cutler has already appeared in this adversary proceeding via counsel.

18.     Upon information and belief, Defendant Catherine Rossouw is a resident of the State of New York. Pursuant to Fed. R. Bankr. P. 7004(b), Rossouw may be served with process in this Adversary Proceeding anywhere that she may be found, including at her business address: 1270 Avenue of the Americas, 30th Floor, New York, New York 10020-1708. Ms. Rossouw has already appeared in this adversary proceeding via counsel.

# IV.
## THE FACTS

***Chapman Cutler was hired to represent GloriFi, but Chapman Cutler favored its other client – Toby Neugebauer – to GloriFi's extreme detriment.***

19.     Chapman Cutler represented GloriFi since around the Company's inception – even with respect to preparing the very corporate documents the Firm later assisted Mr. Neugebauer (GloriFi's co-founder, CEO, and Chairman of the Board) in violating to the detriment of GloriFi and its many other stakeholders. In a sign of things to come, when Chapman Cutler originally performed work for GloriFi, it appears the Firm was only looking out for Mr. Neugebauer's personal interests (and those of Mr. Neugebauer's family members and entities) – not those of GloriFi.

20.     For example, on May 3, 2021, before the Firm had any formal engagement agreement with the Company, Rossouw (one of the Firm's equity partners) assured Mr. Neugebauer that Chapman Cutler was protecting ***Mr. Neugebauer's interests*** when preparing the Company's corporate documents:

> *"It's **your lawyers'** job to think through worst-case scenarios, e.g., what if Rick and Kristi want to oust you or just take the company in a different direction than what you are comfortable with?"*

21.     Unfortunately for GloriFi, the Firm was only doing its job for one of its other clients (Mr. Neugebauer) and was more than willing to actively and intentionally advance positions adverse to GloriFi – anything to satisfy Mr. Neugebauer, Chapman Cutler's prized, self-proclaimed billionaire client.

22.     In Ms. Rossouw's e-mail on May 3, 2021 (excerpted above), she went on to tell Mr. Neugebauer:

*"You will probably have to cede some control if/when you take in material outside money...."*

23.     The sad and incredible hypocrisy in Ms. Rossouw's statement is that Chapman Cutler proceeded to do everything in its power – irrespective of whether it harmed, or even destroyed, GloriFi (the Firm's client) – to assist Mr. Neugebauer's incessant desire to cede no control over the Company (and, in fact, gain more) after GloriFi raised over $50 million from investors and was on the verge of going public. And Chapman Cutler did so on GloriFi's dime.

***Chapman Cutler represented Mr. Neugebauer, and advocated for his self-interests, against Chapman Cutler's own client – GloriFi.***

24.     In February 2022, Chapman Cutler sent GloriFi an engagement agreement, which required an initial retainer in the amount of $195,000. The Firm's engagement agreement expressly states that the "Scope of Representation" would be as follows:

> _Scope of Representation_.  The Firm agrees to represent the Client in connection with (i) the review of agreements between Client and its third party bank partner associated with the marketing and servicing of credit card accounts for a proposed credit card program to be sponsored by Client, (ii) the review of agreements regarding the purchase of receivables arising the credit card accounts from the third party bank partner by Client or a designated third party and the servicing thereof after purchase, (iii) the review and assistance with consumer licensing matters related to such proposed credit card program for Client, and (iv) the structuring, drafting, negotiation and review of documents and disclosures relating to the  securitization of the receivables generated under such proposed credit card program for Client (collectively, the "*Matter*") and not as to other matters unless the Client separately retains the Firm to represent it in such other matters.

25.     The engagement agreement further states that "the Firm will ***not*** represent anyone else in the Matter (including, for example, any principals, owners, officers, directors or employees of the Client)," which should have included Mr. Neugebauer and his family entities. But Chapman Cutler intentionally disregarded the representations the Firm made in its own engagement agreement – and did so in a manner directly adverse to, and against, its own client GloriFi.

26.     On March 28, 2022, Bryan Joiner (known "right-hand-man" of Mr. Neugebauer) e-mailed Ms. Rossouw (GloriFi's lawyer) stating:

> *"Cathy, can we please speak on terms on the new convertible note into GloriFi?*
> *Toby will be leading and needs Chapman representing **his families [sic] interest**."*

27.     Specifically, Mr. Joiner was requesting confirmation from Ms. Rossouw that Chapman Cutler was willing to represent Mr. Neugebauer and the interests of his family ***against GloriFi*** in the "negotiation" of a self-interested term sheet/note that Mr. Neugebauer was trying to force through by any means necessary (which was part of a scheme of self-dealing employed by Mr. Neugebauer, with the knowing participation and assistance of Chapman Cutler, that ultimately led to the complete loss of investor trust/support and GloriFi's untimely demise) (hereinafter, the "Neugebauer Term Sheet").[2] Ms. Rossouw responded without hesitation – notwithstanding the obvious conflict of interest and express promise the Firm made to GloriFi to not engage in such a conflicted representation:

> *"Sure – call me when convenient."*

28.     The next day, on March 29, 2022, Ms. Rossouw confirmed that she added a provision to Mr. Neugebauer's self-dealing term sheet (*i.e.*, the Neugebauer Term Sheet) to ensure that, if Mr. Neugebauer was no longer the CEO of GloriFi, (i) that circumstance would constitute a default under the self-interested note, and (ii) the note's outstanding balance (plus interest) would be immediately due and payable to Mr. Neugebauer by GloriFi.

---

[2]     Specifically, the Neugebauer Term Sheet was the means by which Neugebauer sought to invest $10 million in GloriFi at a valuation of $500 million less than the valuation used for the initial round of funding less than 120 days before (and, as discussed below, exorbitantly less than the $1.7 billion valuation that was circulated earlier that year as part of the potential SPAC merger transaction with DHC Acquisition Corp. ("DHC")).

29.    In other words, Ms. Rossouw crafted a mechanism that would allow Mr. Neugebauer to manufacture a default against the Firm's own client (GloriFi) by simply resigning as the Company's CEO. Ms. Rossouw added this provision even though the Firm knew it directly contradicted the representations Mr. Neugebauer repeatedly made to investors and other stakeholders in GloriFi (as part of establishing normal corporate governance expected of a public company operating in a highly regulated industry) that Mr. Neugebauer would not be the CEO of GloriFi when the Company completed the de-SPAC transaction and went public.[3]

30.    To make matters worse, Ms. Rossouw added provisions to Mr. Neugebauer's self-interested note that would require GloriFi to approve an Asset Purchase and Assumption Agreement, which would have resulted in GloriFi transferring its "tech stack" (*i.e.*, the very asset Mr. Neugebauer represented to GloriFi's Series 1 investors as the allegedly extremely valuable security for their investment) to a separate entity owned and controlled by Mr. Neugebauer and/or his family. Ms. Rossouw sent multiple communications trying to convince others (including GloriFi's new board members – *i.e.*, the individuals the Firm helped Mr. Neugebauer insert on the Board to replace GloriFi's independent board members and remove any roadblocks to Mr. Neugebauer's self-dealing) that this course of action would supposedly be "in the best interests of the [C]ompany." Through these communications, the Firm tried to create the illusion of being

---

[3]    In early 2022, the Company was on the doorstep of closing a de-SPAC transaction that would have taken the Company public at a valuation of almost $1.7 billion. At that time, GloriFi was backed by some of the most successful, wealthy, and well-known investors in the country (*i.e.*, Peter Thiel, Ken Griffin, Vivek Ramaswamy, Rick Jackson, Nick Ayers, and many others). Heading into March 2022, GloriFi's investors were prepared to provide the necessary funding to complete a merger with GloriFi's de-SPAC partner—DHC—at an almost $1.7 billion valuation. But Mr. Neugebauer breached the fiduciary obligations he owed GloriFi by, among other things, refusing to accept the available funding to close the de-SPAC transaction and, instead, attempting to force through various self-dealing transactions that would permit Mr. Neugebauer (or his entities) to provide financing that would improve his personal economic position. As discussed herein, the Firm knowingly participated, and aided and abetted, Mr. Neugebauer in breaching his fiduciary duties in this manner.

concerned about the "best interests of the Company," but the Firm was actually looking out for Mr. Neugebauer's personal interests (to the detriment of the Company) – which is one of the many problems with a law firm impermissibly representing clients against one another in such an obviously conflicted manner. In sum, the Firm assisted Mr. Neugebauer in developing a ploy to transfer what Mr. Neugebauer claimed to be one of GloriFi's most valuable assets to Mr. Neugebauer.

31.    The Firm even included terms in the note that the Firm **knew** directly conflicted with representations and promises Mr. Neugebauer made to investors during an "all investor call" only days prior. Specifically, on March 30, 2022, Ms. Rossouw sent an e-mail to Mr. Neugebauer and Mr. Joiner stating:

> *"Toby/Bryan . . . very clear takeaway . . . from the shareholder call was that Toby said the warrants were <u>out of the deal entirely</u> (not just out if there is a prepayment in the first 30 days or a conversion in connection with a Next Equity Financing)."*

32.    Mr. Joiner's response was short and sweet:

> *"No, he [Mr. Neugebauer] wants warrants included as we discussed."*

33.    Despite the lack of any denial, or attempted clarification, from Mr. Joiner in an effort to refute Ms. Rossouw's understanding that the inclusion of warrants would potentially constitute securities fraud and a breach of Mr. Neugebauer's fiduciary obligations to GloriFi (*e.g.*, the duty to put the interests of the Company ahead of his own), Ms. Rossouw immediately did as Mr. Neugebauer said (per the Firm's usual practice).

34.    Moreover, Ms. Rossouw knew the note constituted a self-interested transaction for Mr. Neugebauer, admitting as much when she wrote:

> *"Let's have someone other than Toby sign for GloriFi."*

***Chapman Cutler recognized it had an irreconcilable conflict but pressed on anyway in violation of fiduciary, ethical, and contractual duties.***

35.     Ms. Rossouw further recognized, ***in writing***, that the Firm had an obvious conflict of interest in representing Mr. Neugebauer in a transaction on which the Firm's current client (GloriFi) was on the other side – even going so far as admitting the need for a conflict waiver:



36.     Incredibly, the Firm requested the conflict waiver from Mr. Neugebauer himself (***long after*** the Firm started to provide conflicted advice) instead of addressing (much less disclosing) the situation with either of GloriFi's two independent board members (Nick Ayers and Keri Findley). Further, the Firm notified Dan Murphy ("Murphy") of the need for a conflict waiver. Murphy, who was new to GloriFi, served as President of Credit Cards and, evidently, was meant to waive the conflict from the GloriFi side.

37.     Shortly thereafter, the Firm (via Ms. Rossouw) sent a woefully deficient, alleged "conflict waiver" to Mr. Neugebauer and Mr. Murphy via e-mail (hereinafter, the "Purported Conflict Waiver"). Two days later, Mr. Neugebauer and Mr. Murphy responded with their respective "approval" of same. However, and aside from the fact that Mr. Murphy likely did not

possess the requisite knowledge or authority to approve it, the Purported Conflict Waiver *grossly* failed to advise GloriFi of the serious conflicts at issue. Specifically, Defendants summarized the conflict as follows:

> Chapman and Cutler LLP has been asked to represent (i) With Purpose, Inc. (d/b/a GloriFi, Inc.) in connection with its planned credit card securitization program (the "**Securitization**"), and (ii) Neugebauer Family Enterprises, LLC and Toby Neugebauer in connection with certain transactions, including the purchase of a convertible note issued by With Purpose, Inc. (d/b/a GloriFi, Inc.), a potential merger transaction between With Purpose, Inc. (d/b/a GloriFi, Inc.) and DHC Acquisition Corp, Inc. and other related matters (the "**Neugebauer Transactions**").

38.    Notably, the Purported Conflict Waiver severely mischaracterized the de-SPAC transaction between GloriFi and DHC as one of several "Neugebauer Transactions." Even worse, the Purported Conflict Waiver later misrepresented that the services the Firm would simultaneously provide to GloriFi and Neugebauer were allegedly "unrelated" and, thus (according to the Firm), "the confidential information received from each client should not be relevant to the other clients or the other matters." In truth, not only were the matters "related," the Firm attempted to represent and advise both Mr. Neugebauer and GloriFi on the same transactions against one another. In sum, the Purported Conflict Waiver included material misrepresentations, intentionally omitted critical information necessary for GloriFi to even consider allowing Defendants to engage in their conflicted representation, and – thus (for the reasons and others) – was completely inadequate and ineffective.

***Chapman Culter knowingly assisted Mr. Neugebauer in his self-dealing against GloriFi and then invoiced GloriFi more than $250,000 for its conflicted and improper representation.***

39.    Both before and immediately after receiving Mr. Neugebauer's and Mr. Murphy's respective/purported "approval" of the Purported Conflict Waiver, the Firm knowingly participated, and aided and abetted, Mr. Neugebauer in executing a classic "squeeze play" against

GloriFi's investors and independent board members in an effort to force the approval of the Neugebauer Term Sheet. This "squeeze play" included (i) threatening the independent board members with litigation in the event they did not approve Mr. Neugebauer's self-interested term sheet, and (ii) misrepresenting to multiple investors that such investor had the "deciding vote" and would force the Company into bankruptcy that very day if the investor who Mr. Neugebauer was communicating with at the moment did not approve the Neugebauer Term Sheet (which, again, was prepared by the Firm).

40.     When the independent board members attempted to uphold their fiduciary obligations to the Company and renewed prior requests for an independent legal analysis regarding any proposed transaction in which Mr. Neugebauer was self-interested (*e.g.*, the Asset Purchase and Assumption Agreement), Mr. Neugebauer responded by seeking to remove Mr. Ayers and Ms. Findley from the Company's Board and replacing them with Mr. Neugebauer's long-time friends and business partners (individuals who would rubberstamp whatever Mr. Neugebauer desired).

41.     The Firm *initially* (and correctly) recognized that Mr. Neugebauer's proposed plan of action was reckless, only designed to further Mr. Neugebauer's personal interests (*i.e.*, would breach the fiduciary obligations Mr. Neugebauer owed GloriFi, including the duty of loyalty), and would harm GloriFi. For example, the Firm *initially* strongly advised Mr. Neugebauer against removing board members for the purpose of engaging in self-dealing:



42.     Unbelievably, only mere hours after Ms. Rossouw sent the e-mail above advising and recognizing that Mr. Neugebauer's proposed course would harm GloriFi, the Firm did an about-face and helped Mr. Neugebauer develop, and execute upon, a plan to effectuate his self-dealing scheme – breaching the obligations both the Firm and Mr. Neugebauer owed GloriFi and causing substantial harm to GloriFi.

43.     Michael Friedman (another one of the Firm's partners) provided Mr. Neugebauer with recommendations for board members to replace Mr. Ayers and Ms. Findley. And Ms. Rossouw (the same Chapman Cutler lawyer who recognized ***in writing*** that removing board members to approve Mr. Neugebauer's self-interested note was improper and would harm GloriFi) prepared the legal strategy and necessary documents to do just that. Put simply, there is a wealth of evidence establishing that the Firm completely disregarded its fiduciary, ethical, and other obligations to GloriFi in favor of carrying out whatever scheme Mr. Neugebauer needed or wanted to improve his individual economic position and personal interests (irrespective of whether Mr. Neugebauer's desires harmed GloriFi). This is a textbook case of a law firm (i) favoring one client (Mr. Neugebauer) to the extreme detriment of another (GloriFi), which constitutes legal malpractice (*i.e.*, actionable negligence), and (ii) knowingly participating/aiding and abetting a

director/officer (Mr. Neugebauer) of the Firm's client (GloriFi) in breaching the fiduciary duties such director/officer owed the Firm's client, which is separately actionable from the legal malpractice claim.

44.     Just when one thinks this matter couldn't get worse, it does.

45.     After the Firm successfully executed on the game plan it helped develop to remove Mr. Ayers and Ms. Findley from the Company's Board – which included the Firm (i) attempting to conceal its actions by ghostwriting documents to be sent by another law firm, and (ii) eliminating all roadblocks to Mr. Neugebauer running roughshod over the Company and engaging in unfettered self-dealing – Ms. Rossouw, in an e-mail to Mr. Neugebauer and his sons (Noah and Nate Neugebauer) dated April 10, 2022, removed any doubt (as if there was any left) that the Firm's loyalty was to Mr. Neugebauer, alone, and that the Firm was actively and knowingly working to the detriment of the Firm's other client:

> *"As we have said, we are your counsel and **ONLY** your counsel. We are not talking directly to anyone else on the GloriFi team or board, and we will not unless you give us express instructions to do so."*

46.     Unbelievable. When Defendants sent this e-mail, they willfully disregarded that the Firm also represented GloriFi.

47.     With sheer audacity, four days later, on April 14, 2022, the Firm *__sent GloriFi an invoice for over $250,000__*!

48.     It is outrageous that the Firm disavowed its loyalty to GloriFi, in writing, and almost immediately thereafter invoiced GloriFi more than a quarter million dollars. It is hard to imagine a more egregious violation of Defendants' fundamental obligations.

***Against its own initial "strong" recommendation to the contrary, Chapman Cutler assisted Mr. Neugebauer in removing independent board members to help Mr. Neugebauer run roughshod over the Firm's own client.***

49.     As if all this wasn't enough, Ms. Rossouw – who is described on the Firm's website as "a transactional private equity and corporate attorney" – decided to play litigator. Ms. Rossouw did so by engaging in more ghostwriting (trying, yet again, to conceal the Firm's fingerprints behind the façade of another law firm).

50.     The Firm helped prepare demand letters to Mr. Ayers and Ms. Findley (who were the independent directors removed from GloriFi's Board by Mr. Neugebauer) after Mr. Ayers and Ms. Findley had the "audacity" to stand up to Mr. Neugebauer's self-dealing and try to protect the Company. Thankfully someone did; the Firm certainly was not protecting the Company.

***Chapman Cutler publicly supports Mr. Neugebauer's attempted lawsuit against Peter Thiel, Vivek Ramaswamy, Ken Griffin's Citadel, and others alleging a fantastical RICO conspiracy.***

51.     The Firm's undying allegiance to Mr. Neugebauer even continued throughout GloriFi's bankruptcy proceeding. The Firm signed the Restructuring Support Agreement ("RSA") in support of the Motion to Convert the GloriFi bankruptcy proceeding to chapter 11, which was filed at Mr. Neugebauer's direction over 17 months into the case.

52.     By signing the RSA, Chapman Cutler affirmed to the federal bankruptcy court that the Firm supported the proposed "Neugebauer chapter 11 conversion plan." As mentioned above, the plan did not propose the restructuring of any business for GloriFi. Instead, the sole strategy of the "Neugebauer chapter 11 conversion plan" was to pursue a lawsuit alleging a grand RICO conspiracy against approximately 30 proposed defendants, which include some of the most successful and influential business leaders in the country (*e.g.*, Ken Griffin's Citadel, LLC; Vivek

Ramaswamy; Joseph Ricketts; Joe Lonsdale; Peter Thiel; Jeff Sprecher; Rick Jackson, Nick Ayers, Keri Findley, and more).

53.     Chapman Cutler signed the RSA as an alleged "supporting general unsecured creditor" and represented that the Firm's "amount of claim" is $519,963.17. However, as evidenced by the claims register, Chapman Cutler did not file a verified proof of claim establishing itself as a claimant. Thus, it appears the Firm deceptively signed the RSA (wrongfully claiming to be a "creditor" with a "claim" against the Estate) in Chapman Cutler's attempt to assist Mr. Neugebauer in his efforts to pursue the aforementioned RICO conspiracy claims.

54.     It appears the Firm supported and/or assisted Mr. Neugebauer in employing various schemes and tactics in the GloriFi bankruptcy proceeding. These same tactics were found by this Court, in a recent opinion, to constitute "an abuse of the bankruptcy process."

### *Chapman Cutler's wrongdoing prevented GloriFi from going public at a valuation of $1.7 billion.*

55.     Rather than abiding by the obligations the Firm owed GloriFi as its client, the Firm intentionally took actions designed to harm the Company and benefit Mr. Neugebauer (and his other, separate entities). The Firm's actions (and deliberate inactions) proximately caused GloriFi to suffer *enormous* financial harm.

56.     GloriFi was on the verge of closing a de-SPAC transaction with DHC and going public at a valuation of approximately ***$1.7 billion***. But for the Firm's badly conflicted representation of GloriFi (and resulting failure to advise GloriFi against taking the actions described herein that were designed to benefit Mr. Neugebauer personally; actions which prevented GloriFi from securing the available funding from existing investors to close the de-SPAC transaction), GloriFi would have been able to complete the de-SPAC transaction and go

public at a valuation of approximately $1.7 billion. Additionally, and/or alternatively, but for the Firm's knowing participation and role in aiding and abetting Mr. Neugebauer through and/or in, among other things, (i) the Firm's substantial role in developing and executing the playbook/strategy for Mr. Neugebauer's unrelenting and sustained self-dealing, (ii) breaching of the fiduciary duties Mr. Neugebauer owed GloriFi, and (iii) the commission of fraud to the Company's extreme detriment (as discussed herein), GloriFi would have been able to complete the de-SPAC transaction and go public at a valuation of approximately $1.7 billion.

57.     Specifically, the Firm's misdeeds, knowing participation in and aiding abetting Mr. Neugebauer's breaches of the fiduciary duties he owed GloriFi, and collusion with Mr. Neugebauer was a proximate cause of the investors (and potential investors) losing confidence in GloriFi and the Company's resulting inability to raise the funding needed to close the de-SPAC transaction and go public (funding the Firm knew was readily available from existing outside investors but for the scheme of self-dealing and fraud outlined herein in which the Firm knowingly participated and aided/abetted Mr. Neugebauer).

58.     In sum, the Firm's malfeasance was a proximate cause of the Company's inability to secure the necessary funding to close the de-SPAC transaction and go public at a valuation of approximately *$1.7 billion*. Instead, the Company now sits in chapter 7 bankruptcy due, at least in large part, to the Firm's conflicted representation, malpractice, and knowing participation/aiding and abetting of Mr. Neugebauer's breaches of the fiduciary duties he owed GloriFi.

***Chapman Cutler repeatedly exceeded the scope of the engagement agreement and grossly failed to advise GloriFi of the Firm's conflicted representation.***

59.     As set forth above, the "Scope of Representation" outlined in the engagement letter between the Firm and GloriFi was expressly limited to four items relating to GloriFi's credit card

program. However, Defendants repeatedly exceeded the scope of the engagement agreement by intentionally taking actions to harm GloriFi and benefit Mr. Neugebauer (*i.e.*, many, if not all, of the actions taken by Defendants about which the Trustee complains in this lawsuit are actions taken outside the stated "Scope of Representation" in the representation agreement). Defendants utterly failed to inform GloriFi—the Firm's *client*—that, at all relevant times, Defendants not only knew what Mr. Neugebauer was doing to harm the Company, but Defendants knowingly participated and actively assisted Mr. Neugebauer in his efforts, thereby making Defendants also culpable for such harm by, among other things, developing and executing the playbook/strategy for the self-dealing and fraudulent scheme discussed herein.

60.     The Purported Conflict Waiver provides no excuse for Defendants' clear misconduct. Specifically, at no point in the Purported Conflict Waiver did Defendants inform GloriFi: (1) that the "note" referenced as one of the "Neugebauer Transactions" was, in fact, a self-interested term sheet/note that Mr. Neugebauer, with the assistance of Defendants, was trying to force through; (2) that Defendants knew that the Neugebauer Term Sheet (i) directly conflicted with promises Mr. Neugebauer made to GloriFi's investors and (ii) included terms that would result in GloriFi's tech stack being transferred to Mr. Neugebauer and/or his family; (3) that Defendants were, at the exact same time, advising Mr. Neugebauer – and developing the legal mechanics of this scheme – on how to (i) oust GloriFi's two independent board members and (ii) replace such board members with Mr. Neugebauer's friends/business associates to ensure that Mr. Neugebauer was free from any governance oversight and could engage in unfettered self-dealing; and/or (4) that there would ever be (let alone less than two weeks later) a time when the Firm would state that it was "ONLY" Mr. Neugebauer's counsel and would refuse to talk "to anyone else on the GloriFi team or board" without Mr. Neugebauer's "express instructions."

61.     Moreover, and aside from these glaring omissions, the Purported Conflict Waiver expressly misrepresented that the services the Firm would simultaneously provide to GloriFi and Neugebauer were "unrelated" and that, as a result, "the confidential information received from each client should not be relevant to the other clients or the other matters." This could not be further from the truth. In reality, the Firm *knew* that the information it received from both Mr. Neugebauer and GloriFi was directly related, yet the Firm intentionally attempted to mislead GloriFi into believing otherwise. In fact, the Firm knew that it would be improperly representing and/or advising GloriFi and Mr. Neugebauer on the same transactions in which the Firm's concurrent clients were on opposite ends of the proposed transactions.

## V.
### CAUSES OF ACTION

COUNT 1:      NEGLIGENCE (LEGAL MALPRACTICE) – AGAINST ALL DEFENDANTS

62.     The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

63.     As GloriFi's attorneys and law firm, Defendants owed GloriFi the duty to act with reasonable care. Specifically, in Defendants' representation of GloriFi, Defendants were required to exercise the standard of care that would be exercised by a reasonably prudent (conflict free) attorney under the same or similar circumstances. For the reasons set forth herein, Defendants fell well below that standard and, thus, breached their duty of care to GloriFi. As discussed above, the Defendants' representation of GloriFi was plagued by obvious conflicts of interest. Defendants favored Mr. Neugebauer (and advocated for/protected Mr. Neugebauer's self-interests) to the extreme detriment of the Firm's other client – GloriFi.

64.     As discussed above, the Firm's negligence was a proximate cause of the investors (and potential investors) losing confidence in GloriFi and the Company's resulting inability to

raise the funding needed to close the de-SPAC transaction and go public at a valuation of approximately $1.7 billion (funding that the Firm knew was readily available from existing outside investors but for the scheme of self-dealing and fraud the Firm helped Mr. Neugebauer initiate and execute against the Firm's own client). Clearly, a reasonably prudent (conflict free) attorney under similar circumstances would have advised its client on how to protect against Mr. Neugebauer's self-interested actions – the Firm did the opposite.

65.     GloriFi suffered significant actual and consequential damages as a result of Defendants' negligence and breaches of their duty of care. The Trustee seeks all recoverable damages from Defendants resulting from their negligence, including, but not limited to, the entire loss of GloriFi's enterprise value.

**COUNT 2:     AIDING AND ABETTING / KNOWING PARTICIPATION IN NEUGEBAUER'S BREACH OF FIDUCIARY DUTY TO THE DEBTOR – AGAINST ALL DEFENDANTS**

66.     The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

67.     During the relevant time period, Mr. Neugebauer, who operated as an officer, director, and controlling shareholder of the Debtor, was a fiduciary to the Debtor. As such, in all these capacities, Mr. Neugebauer owed the Debtor fiduciary duties, including the duties of loyalty and care. Given their representation of GloriFi and Mr. Neugebauer (and his family entities), Defendants were fully aware of Mr. Neugebauer's fiduciary role and fiduciary duties owed to the Debtor.

68.     Mr. Neugebauer's breaches of fiduciary duty directly and proximately caused the Debtor injury by, among other things: leading investors to lose confidence in GloriFi, the Company not being able to close the de-SPAC transaction and go public at a valuation of approximately $1.7 billion, and – ultimately – landing GloriFi in chapter 7 bankruptcy only months later.

69.     Defendants had knowledge that Mr. Neugebauer was breaching his fiduciary duties to the Debtor and intended to (and did) substantially encourage, assist, and participate with Mr. Neugebauer in his actions. For example:

a.   Defendants helped prepare the Neugebauer Term Sheet, which Defendants *knew* directly contradicted representations that Mr. Neugebauer made to GloriFi's investors and even would require GloriFi to approve an agreement that would have resulted in GloriFi transferring its tech stack to Mr. Neugebauer and/or his family companies;

b.   Defendants provided advice and recommendations, prepared the necessary corporate documents, and even covertly prepared demand letters, to have GloriFi's two independent board members removed (in an effort to remove any roadblocks to Mr. Neugebauer engaging in unfettered self-dealing to GloriFi's extreme detriment) after the independent directors had the "audacity" to stand up to Mr. Neugebauer's self-dealing and try to protect the Company, and Defendants helped Mr. Neugebauer replace these independent board members with two of Mr. Neugebauer's friends (who, unbelievably, Defendants involved in the scheme before they even replaced the two independent board members);

c.   Defendants prepared and coordinated the playbook/strategy that Mr. Neugebauer needed to advance his self-dealing transactions and maintain unfettered control of GloriFi (to the detriment of GloriFi's stakeholders); and

d.   Defendants assisted Mr. Neugebauer in taking self-interested actions – designed to improve Mr. Neugebauer's personal economic position – instead of securing the funding needed from existing, outside investors, which Defendants knew was

readily available, to close the de-SPAC transaction and take the Company public at an approximate $1.7 billion valuation.

70.     Defendants were aware that they were participating in a breach of Mr. Neugebauer's fiduciary duties to the Debtor (or, at a minimum, Defendants recklessly aided, abetted, and/or participated in same). Defendants had extensive knowledge of Mr. Neugebauer's actions, and Defendants willingly participated in assisting Mr. Neugebauer's efforts in furthering his unlawful schemes.

71.     At all relevant times, Defendants, in order to aid Mr. Neugebauer, acted in conflict with (or in disregard of) their duties to the Debtor to ignore clear conflicts of interest and prioritize Mr. Neugebauer's interests over the Debtor's, allowing Mr. Neugebauer to engage in self-dealing transactions and disregard normal corporate governance, all to cloak Mr. Neugebauer's scheme with the appearance of legitimacy (through the approval/involvement of outside counsel).

72.     Defendants' services and assistance to Mr. Neugebauer were essential to and a substantial factor in Mr. Neugebauer's self-dealing, fraud, and gross mismanagement, which was a proximate cause of catastrophic harm to the Debtor and the ultimate demise of GloriFi.

73.     Moreover, Defendants did not take any steps to protect the Debtor and mitigate its harm. Instead of representing the Debtor's interests (*i.e.*, their own client), Defendants took actions to effectuate Mr. Neugebauer's interests (*i.e.*, their other, adverse client). Defendants, through action and omission, aided and abetted Mr. Neugebauer to implement a scheme to remove all independence and oversight from GloriFi's Board and engage in self-dealing transactions to the detriment of GloriFi's other stakeholders, which ultimately culminated in killing the potential de-SPAC merger between GloriFi and DHC.

74.     As a result, Defendants knew or should have known that their aiding, abetting, and/or participation in Mr. Neugebauer's breaches of fiduciary duty would result in harm to the Debtor.

75.     GloriFi suffered significant actual and consequential damages as a result of Defendants' aiding, abetting, and participation in, and encouragement of, Mr. Neugebauer in his breaches of fiduciary. The Trustee seeks all recoverable damages from Defendants resulting from their aiding, abetting, and participation in, and encouragement of, Mr. Neugebauer in his breaches of fiduciary, including, but not limited to, the entire loss of GloriFi's enterprise value.

## VI.
### EXEMPLARY DAMAGES

76.     The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

77.     The Trustee seeks an award of exemplary damages in this case because, for the reasons set forth herein, Defendants acted with malice (*i.e.*, the specific intent to cause substantial injury or harm to GloriFi), an extreme degree of risk and a conscious indifference to the rights of GloriFi, and/or in a fraudulent manner, Defendants committed gross negligence, and Defendants committed other acts (as outlined herein) and in a manner that justifies the imposition of exemplary damages under applicable law.

## VII.
### CONDITIONS PRECEDENT

78.     All conditions precedent to maintaining this action have occurred and been satisfied or have been excused and/or waived.

## VIII.
### CONCLUSION

Based on the foregoing, the Trustee respectfully requests the following relief from the Court:

a)  Judgment against Defendants for all actual and consequential damages and any applicable special or other damages (including disgorgement and fee forfeiture);

b)  Judgment against Defendants for exemplary damages;

c)  Judgment against Defendants for pre- and post-judgment interest at the maximum rate permitted by law;

d)  Judgment against Defendants for the reasonable attorney's fees and recoverable litigation expenses the Trustee incurs in this action and for costs of suit; and

e)  Such other and further relief to which the Trustee is entitled.

Respectfully submitted,

*/s/ Chase J. Potter*

**CHASE J. POTTER**
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com

**JOSHUA J. IACUONE**
Texas Bar No. 24036818
E-Mail: josh@imcplaw.com

**GREG MCALLISTER**
Texas State Bar No. 24071191
E-Mail: greg@imcplaw.com

**JOSHUA L. SHEPHERD**
Texas Bar No. 24058104
E-Mail: shepherd@imcplaw.com

**JESSE A. OKIROR**
Texas Bar No. 24065843
E-Mail: jesse@imcplaw.com

**ANNA OLIN RICHARDSON**
Texas Bar No. 24102947
E-Mail: anna@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone:     (214) 432-1536

**COUNSEL FOR THE AGENT AND
SPECIAL COUNSEL FOR TRUSTEE**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system on this 14th day of July, 2025.

*/s/ Chase J. Potter*
**CHASE J. POTTER**